## J. A. PIERCE v. J. A. WEAVER ET AL.

### (Case No. 1919)

1. CHARITABLE TRUSTS — TRUSTEES — APPOINTMENT — ALIENATION — CESTUI QUE TRUST — EVIDENCE.—D conveyed to three trustees a tract of land for the purpose of establishing and maintaining a school for the education of white youths of the county, the white population of the town to have entire control of the school; but no provision was made for appointing trustees in case of vacancies. Two of the trustees died, and the donor made a second deed, conveying the property for the same purposes, to five trustees, and providing the manner of filling vacancies. W conveyed the same land to the same five trustees for the same purpose. These trustees then conveyed to defendants in trust for the M. E. Church, and a sectarian school was maintained upon the lot. The church trustees also claimed, under a deed purporting to have been made by the white population of the town. Plaintiff brought suit in behalf of the white population of the town, to have new trustees appointed under the first deed from D, and to have the other deeds cancelled. *Held:*

(1) If the superior title was in D, and no power to create new trustees was reserved by D in his first deed, or conferred on any other person, such trustees could only be appointed by the court. (Perry on Trusts, 294.)

(2) If the title was in W, the trustees appointed by him had full power to administer the trust in accordance with the terms of the deed creating it, unless removed by some proper court for sufficient cause.

(3) Courts appoint trustees to administer trusts of this character only when a power to create them in some other way has not been provided, unless under facts exceptional in character.

(4) Alienation of the trust estate is not always treated *per se* as a breach of trust. (Hill on Trustees, 678.)

(5) If the property was vested in the five trustees by the deeds from D or W for the purposes stated, they had no power to alienate the trust estate, and their deed should have been cancelled.

(6) If the property was not in law vested in them, it was so in form, and their conveyance was a cloud upon the title, which ought to have been removed by a cancellation of the deed.

(7) Buildings erected upon the lot, no matter from what source the funds with which they were erected came, became part of the lot, the legal title to them vested in the trustees, and no one or more of the inhabitants had an interest in the property which he or they could alienate.

(8) The white inhabitants of the town, as a community, could have the school erected on the lot carried on through such instrumentalities as they deemed proper, so long as the use was such as was contemplated by the donor. See opinion for uses held'probably not in conflict with the intent of the grantor.

(9) Whatever means the inhabitants might elect to carry out the intention of the grantor, it was the duty of the trustees to see that the property was not used for a purpose never contemplated by him.

(10) The inhabitants had no power to turn over the possession of the property to any person or association for all time to come, neither had the trustees.

(11) See statement of case for instruments held to have been improperly admitted in evidence.

(12) Though a deed from the nominal plaintiff, conveying the lot to defendants, might be admitted in evidence against him without proof of its execution, it could not affect the other inhabitants for whom he sued, and an instrument executed by him alone would confer no right on defendants.

APPEAL from Hopkins. Tried below before the Hon. W. P. McLean.

This suit was brought by appellant for himself and the other white citizens, inhabitants of the city of Sulphur Springs, Texas, against James A. Weaver, A. N. Edwards, R. H. Beale, E. A. Kellogg and F. Z. T. Jackson, on the 8th of August, 1881, in the District Court of Hopkins county, Texas.

Appellant alleges in his petition, in substance, that on the 2d of February, 1867, Dr. O. S. Davis deeded to trustees, for the white citizens of Sulphur Springs, four acres of ground in that city, for the purpose of establishing and maintaining a permanent, first-class school for the education of the white youths of the country, and for the city of Sulphur Springs for all time to come, securing to them an eligible site upon which to build a suitable school building to be used only for school purposes, in which deed no provision was made for the appointment or succession of trustees. Appellant alleged that the original trustees named in the deed were dead or removed beyond the jurisdiction of the court, and had abandoned their trust; and that appellees had, upon some pretended claim, forcibly entered the premises and ejected appellants therefrom on the 1st of January, 1877, upon which premises appellants claimed they had erected a large and com-

modious school building.  Appellants alleged that appellees had wrongfully converted the same to the use and benefit of the Sulphur Springs District Conference of the M. E. Church, South, using the same as a sectarian and denominational school and boarding-house, and thereby diverting the same from the use and purpose of the original trust.  Appellants asked the court to cancel and hold for naught the pretended claim of appellees, and to appoint trustees to administer the trust; and that the trustees be placed in posession of the premises to administer the trust for the use and benefit of the white citizens of the city of Sulphur Springs for school purposes only.

Appellees answered, first, by general demurrer; second, by general denial and plea of not guilty; third, by special answer, in which they set up absolute title under deed from O. S. Davis and others to the Sulphur Springs District Conference of the M. E. Church, South, and that appellees held the same as trustees for the Sulphur Springs District Conference of the M. E. Church, South.

On the call of this cause in the district court on the 9th of April, 1885, the cause was tried by a jury, and a verdict was returned by the jury for the appellees—finding for the appellees as to the possession and control of the property described in plaintiffs' petition, and that the title to the property had not been divested out of the beneficiaries in the original donation; upon which judgment was rendered for appellees, quieting them in their possession, and against appellants for costs.

The appellees offered, on trial, in evidence, two certain instruments in writing, purporting to be a relinquishment of all claim of one hundred and seventy citizens of Sulphur Springs, to the Sulphur Springs District Conference of the M. E. Church, South, by reason of their contributing money to the erection of a school building upon the premises in controversy, which instruments in writing were not acknowledged or proven in any manner.

*Harris & Leach*, for appellant.

*A. A. Henderson, E. B. Perkins* and *Terhune & Yoakum*, for appellees, cited:  Perry on Trusts, secs. 285-287; Willard's Eq. Juris., 589.

STAYTON, ASSOCIATE JUSTICE.—One of the leading purposes of this suit was to have trustees appointed to supply the vacancies caused by the death or removal of the trustees named in the original deed made by O. S. Davis, which, on its face, conveyed the land to named trustees, to be by them held forever as a place whereon to

establish and maintain a permanent first-class school for the education of the white children of the county.

That deed named three trustees, but provided no manner by which new trustees might be created from time to time as vacancies might occur.

It seems that two of the trustees had died and that the other had removed from the county, or otherwise ceased to act.

That deed was made in 1867, and to remedy the defect in the deed, and to provide a mode by which new trustees might be created whenever necessary, O. S. Davis, on the 15th of July, 1875, made another deed for the same purpose, in which he named and conveyed to five trustees, one of whom was the only surviving person named as trustee in the former deed, the same property. This deed provided a manner in which new trustees might be appointed.

At the same time James A. Weaver conveyed the same property to the same trustees named in the second deed made by Davis, and for the same purpose, in which was contained the same provisions for the appointment of new trustees from time to time as may become necessary.

It is claimed by the defendants that this last deed really conveyed the title, as the superior title is claimed to have been in Weaver.

No proof was made from which it might have been determined by what deed the title to the property actually passed to trustees.

If the title passed by the first deed made by Davis, then, from the averments of the petition, and from the evidence, it was necessary that trustees be appointed; but Davis could not, in the absence of a provision in the deed empowering him to do so, create new trustees. The deed created a trust for charitable uses, if the donor had title, and he had no further power to create new trustees.

As no power to create new trustees was reserved by the donor, or conferred by the deed on any other person or persons, such trustees could only be appointed by the courts. Perry on Trusts, 294.

If, however, title to the property was in Weaver, then his deed created the trust, named trustees, and provided a manner in which new trustees may be created by the beneficiaries. Inquiry should have been made whether the trust was in fact created by the deed of Davis or the deed of Weaver, and if found to have been created by the latter, then the trustees named in it have full power to administer the trust in accordance with the terms of the deed creating it, unless they be removed by some proper court for sufficient cause.

Courts will not disregard the will of the donor of property conveyed in trust for charitable uses, even in reference to the manner of

appointing new trustees, but will leave the beneficiaries to pursue the method pointed out by the donor in his deeds, unless facts be shown which make such action necessary to carry out the will of the donor.

Courts only appoint trustees to administer such trusts when a power to create them in some other way has not been provided, unless under facts exceptional in character. There was no prayer for the removal of the trustees appointed by Weaver, it being assumed that they, in law, were never trustees, and it becomes unnecessary to consider whether, if the trust really vested in them, their attempted alienation of the trust property would be treated necessarily as such a breach of the trust as to require their removal. Cases have arisen in which the alienation of the trust estate has not been treated *per se* as a breach of trust. Hill on Trustees, 673.

Another purpose of the suit was to cancel the deed made by the trustees named in the last deed made by Davis and in the deed made by Weaver, to the trustees for "The Sulphur Springs District Conference of the Methodist Episcopal Church, South," purporting to convey the trust estate.

If the property was vested in them, considering the purpose for which the trust was created, it is evident that they had no power to alienate the trust estate, and the deed should have been cancelled.

If the property was not in law vested in them, it was so in form by the deeds under which they held, and their conveyance was a cloud upon the title likely to embarrass the beneficiaries in the proper use of the trust estate, which ought to have been removed by a cancellation of the deed.

The same is true as to any conveyance made by any of the white inhabitants of the city of Sulphur Springs who had contributed to the erection of buildings on the lot. When erected, from whatsoever source the funds with which the erection was made, the buildings became part and parcel of the lots. The legal title had vested in trustees, and no one or more of the inhabitants had an interest in the property such as he or they could alienate.

The deeds each vest whatever title the makers had to the lot in the trustees; but they seem, from the terms of the deeds, to be made the mere custodians of the title, not charged with the establishment, maintenance or control of the institution of learning which the donor contemplated would at some time be erected thereon by the white citizens of "Sulphur Springs." The desire was to "aid the cit zens of said city in establishing and maintaining a permanent, first-class school for the education of the white youths of the county, and in the erecting and maintaining of suitable buildings for the same, and in order

to secure to the white citizens of said city of Sulphur Springs now and for all time to come, a good and sufficient title to an eligible and convenient lot of ground, to be occupied and used solely for said buildings and said educational purposes."

For this purpose the title to the lot is declared to vest in the trustees and their successors "forever in trust for the sole use and benefit of the white inhabitants of Sulphur Springs as a site for a first-class school for whites as aforesaid." The maintenance, control and entire management of the school to be established seems to have been left by the donor or donors to the white inhabitants of the city of Sulphur Springs as a community, and we see no reason why they may not have the school to be conducted on the lot carried on through such instrumentalities as to them may seem proper, so long as the use is such as was contemplated. They may place the property in the hands of some one who, under their control, will undertake the maintenance and control of such a school as was contemplated by the donor. They may employ teachers, as may other communities, who shall conduct the school under such supervision as the beneficiaries (the white citizens of the city) may provide. We see no reason why they may not place the property in charge of even the trustees of the particular District Conference of the Methodist Episcopal Church, South, if they are by the inhabitants of the city thought to be proper instrumentalities with which to accomplish the intent of the donor. There would be, however, an objection to the establishment of a sectarian school on the property; for some of these persons who are made beneficiaries by the terms of each of the deeds might, as a matter of conscience, not be willing to attend a school in which the tenets of a particular church, which they believed to be untrue, were taught, and thus the free use of the property by all the intended beneficiaries in a degree be prevented.

As before said, the manifest intent of the donor was to aid in the establishment of such school as was contemplated; and in effectuating that purpose the inhabitants of the city would be entitled to bring to their assistance any contribution made from the funds of the state for the support of public free schools, but this they could not do if a sectarian school be maintained on the premises.

We see no reason to doubt that the property, under the terms of the donation, might be used for a public free school under the general provisions of the law, nor do we see reason to doubt that it might be used by the beneficiaries under the management of the city, if it elect to manage the public free schools therein, under the laws and sec-

tion 10, article 11, of the Constitution. In whatever manner the white inhabitants may elect to carry out the intention of the donor, it will still remain the duty of the trustees to see that the property be not used for a purpose never contemplated by him.

While the inhabitants of the city may select the instrumentalities for the conduct of the school as may best suit them, they have no power to turn over the possession of the property to any other persons or association of persons for all time to come, for this would be equal to parting with the title to the property entirely, which is a thing neither they nor the trustees have the power to do any more more than they have to divest the trustees of the fee to the land, or themselves of the beneficial use contemplated by the donor. They must use it for the purpose intended, but may exercise a discretion as to the manner and means by which that is to be accomplished.

The judgment entered declares that the title of the beneficiaries was not divested by the attempted conveyance, but then proceeds to adjudge "that the defendants be *forever* quieted in the possession and control of said property." This, for all practical purposes, was equivalent to vesting the fee in the defendants, without limitation or instruction as to the use they must make of it. Neither the trustees named in any of the deeds nor the white inhabitants of the city had any power to confer such a right on the trustees defendant, or upon the association represented by them, and we can not see from whence springs such right or power of the court below to declare it.

The instruments purporting to have been executed by the white inhabitants of the city no doubt were made the basis of this right, but their makers having no power to convey such a right, the instruments can not have that effect. They were objected to when offered because irrellevant, and for want of proof of their execution, and we are of the opinion that the last objection named should have been sustained. It is true that it is alleged that one of the instruments was executed by the plaintiff, and this seems to be true; but it must be remembered that he sues for the other inhabitants as well as for himself, and while it might be admissible against him without proof of its execution, yet, as an instrument executed by him alone, it would confer no right on the defendants. The instruments, if their due execution be proved would be admissible, as would be any other act of the white inhabitants of the city, to show that the trustees defendant, or those they represent, had been selected as an instrumentality through which the school should be maintained and conducted, but this would be the limit of their effect.

We have not thought it necessary to consider the assignments of

error separately, but have only thought it necessary to refer to such matters as illustrate the rights and duties of the several parties, and to refer to such rulings of the court below as require a reversal of the judgment.

The judgment will be reversed and the cause remanded.

Reversed and Remanded.

[Opinion delivered December 1, 1885.]